United States District Court
Southern District of Texas
**ENTERED**
July 29, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| HURSHELL WHEELER, TDCJ # 00870713 | § § § |
| Plaintiff, | § § |
| v. | §   CIVIL ACTION NO. H-22-1705 |
| BRYAN COLLIER, *et al.*, | § § § |
| Defendants. | § § |

## MEMORANDUM OPINION AND ORDER

Hurshell Wheeler, an inmate in the Texas Department of Criminal Justice – Correctional Institutions Division (TDCJ), has filed a civil-rights complaint under 42 U.S.C. § 1983, alleging that he is confined in restrictive housing at the Ferguson Unit, in violation of the Fourteenth Amendment. (Docket Entry No. 9).[1] Wheeler represents himself and has been granted leave to proceed without prepaying the filing fee.

Wheeler has filed a motion for summary judgment, (Docket Entry No. 34), to which the remaining defendants—Richard Bledsoe and Joel Guzman—have filed a response in opposition. (Docket Entry No. 33). The defendants have also moved for summary judgment. (Docket Entry No. 39). Wheeler has filed a response. (Docket Entry No. 42). Having considered the motions and responses, the applicable law, and the record, the court grants the defendants' motion, denies the plaintiff's motion, and dismisses this case. The reasons are explained below.

---

[1] For purposes of identification, all page numbers reference the pagination imprinted on each docket entry by the court's Electronic Case Filing (ECF) system.

I.  **Background**

   A.  **Wheeler's Allegations**

Wheeler alleges that he is indefinitely confined in restrictive housing[2]—a form of solitary confinement—at the Ferguson Unit due to his alleged status as a gang member. (Docket Entry No. 9 at 4). On July 11, 2000, Wheeler was designated as a member of a "Security Threat Group" (STG) due to his status as a gang member. (*Id.*). He was placed in restrictive housing. (*Id.*). On June 23, 2004, Wheeler renounced his gang membership and began the Gang Renouncement and Disassociation (GRAD) process. (*Id.*). The Texas Department of Criminal Justice requires an inmate to complete the GRAD process in order to be recognized as an ex-gang member. (*Id.* at 4–5). This recognition is required for release from confinement in restrictive housing. (*Id.* at 4–5). Wheeler successfully completed the GRAD process on May 23, 2007. (*Id.* at 5). As a result, his status was changed to "ex-STG member" and he was released from restrictive housing. (*Id.*).

Wheeler claims that on August 31, 2010, without "any new specific documentary or physical evidence to support renewed gang affiliation, the Roach Unit STG department erroneously reconfirmed [him] as active STG and confined [him] to ad[ministrative] seg[regation] once again." (*Id.*). Wheeler asserts that the decision to reconfirm him as a member of a Security Threat Group and confine him in restrictive housing was based on a tattoo. (*Id.*). This tattoo was used to confirm his gang membership status in July 2000. (*Id.*). Wheeler had not removed or covered the tattoo because to do so was not required for him to renounce his gang membership. (*Id.*). Wheeler asserts that because removing or covering the tattoo was not required to renounce his gang membership, the tattoo should not be allowed as evidence to reconfirm him as a member

---

[2] In the defendants' motion for summary judgment, they state that TDCJ now uses the term "restrictive housing" instead of "administrative segregation." (*See* Docket Entry No. 39 at 1; *see also* Docket Entry No. 39-5 (defendants' summary-judgment evidence of the TDCJ Restrictive Housing Plan)). In accordance with current TDCJ terminology, the court will use the term "restrictive housing."

of a Security Threat Group. (*Id.*). He further argues that because an inmate can participate in the GRAD process only once, he is indefinitely confined in restrictive housing because there is no alternative method for release. (*Id.*).

Wheeler alleges that being confined in restrictive housing deprives him of a number of privileges that he would have in general population. (*Id.*). He describes his confinement in restrictive housing, as follows:

> Ad[ministrative] Seg[regation] deprives me of a number of privileges that I would be afforded if I was in the general population. I am confined in a solitary cell that consist[s] of a toilet/sink combination, two metal bunk beds, and an open faced storage locker. I am allowed out of my cell for only one hour a day for recreation and shower purposes, before leaving my cell I am stripped searched and handcuffed. I am not allowed contact visits with family and friends. I can't participate in educational, vocational, religious, or cognitive classes. I am repeatedly denied parole because of my alleged status as a gang member.

(*Id.* at 5–6).

Wheeler seeks injunctive relief and immediate release from restrictive housing. (*Id.* at 4).

**B.     Procedural Posture**

Wheeler sued the following defendants: (1) Bryan Collier, TDCJ's Executive Director; (2) Richard Bledsoe, the then-current Region I Security Threat Group Coordinator; (3) Joel Guzman, the Security Threat Group supervisor at the Ferguson Unit; and (4) Charlie Reid, the former Security Threat Group supervisor at the Ferguson Unit.

After screening Wheeler's pleadings as required by the Prison Litigation Reform Act, 28 U.S.C. §§ 1915A and 1915(e)(2)(B), the court ordered Collier, Bledsoe, and Guzman to answer. (Docket Entry No. 11). The court did not order service on defendant Charlie Reid. In December 2022, Collier, Bledsoe, and Guzman filed a motion to dismiss, which Wheeler opposed. (Docket Entry Nos. 14, 23). The court granted the motion in part and denied it in part. (Docket Entry No. 26). The Fourteenth Amendment Equal Protection claim and the claims against Collier were

dismissed. The court also dismissed Wheeler's claims against Reid pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim on which relief may be granted. Wheeler's Fourteenth Amendment Due Process claim against Bledsoe and Guzman remained.

**C.     The Defendants' Motion for Summary Judgment**

Bledsoe and Guzman now move for summary judgment on the Fourteenth Amendment Due Process claim. (Docket Entry No. 39). Wheeler has responded. (Docket Entry No. 42).

The defendants have submitted the following evidence in support of their summary judgment motion:

- Grievance records for Wheeler from January 1, 2021, to December 15, 2022, Exhibit A (Docket Entry No. 39-1)

- Affidavit of Richard Garcia, a manager with the TDCJ Security Threat Group Management Office, Exhibit B (Docket Entry No. 39-2)

- Security Threat Group Operations Manual 9.0, Gang Member Disassociation Process, Exhibit C (Docket Entry No. 39-3)

- Affidavit of Charley Valdez, a program supervisor with the TDCJ Classification and Records Department, Exhibit D (Docket Entry No. 39-4)

- The TDCJ Restrictive Housing Plan, Exhibit E (Docket Entry No. 39-5)

- Classification records for Wheeler from January 1, 2000, to December 14, 2022, Exhibit F (Docket Entry No. 39-6)

- The TDCJ Classification Plan, Exhibit G (Docket Entry No. 39-7)

(*See* Docket Entry No. 39).

Wheeler is currently serving a 35-year sentence for arson and a 10-year sentence for theft of property. (*See Inmate Info. Search*, Tex. Dep't of Crim. Just., https://inmate.tdcj.texas.gov/InmateSearch/viewDetail.action?sid=04560542 (last visited July 22, 2024); Docket Entry No. 39-2 at 2; Docket Entry No. 39-4 at 3). In his affidavit submitted as part of the summary judgment evidence, Mr. Garcia, a manager of the TDCJ Security Threat Group

4

Management Office, states that the TDCJ first identified Wheeler as a member of a Security Threat Group in July 2000, when the Security Threat Group Management Office confirmed his affiliation with the Aryan Circle gang.³ (Docket Entry No. 39-2 at 3). The Aryan Circle gang is designated as a Security Threat Group and is considered one of the most dangerous gangs in the TDCJ. (*Id.*). Confirmed members of the Aryan Circle are in restrictive housing because of the group's propensity for violence and institutional disruptiveness; the group's purpose of promoting white supremacy; the organizational structure of the group; acts of violence attributed to the group, such as assaults, murder, and conspiracy to murder; and conspiracies among its members to commit illegal activity both inside and outside the TDCJ. (*Id.*). Wheeler's initial designation as a member of the Aryan Circle gang was based on: (1) his self-admission; (2) a known Security Threat Group tattoo; (3) other racial tattoos on his back, such as a swastika and "klansman"; (4) known Security Threat Group paraphernalia in his possession, including Aryan Circle bylaws; and (5) correspondence with other individuals suspected of Aryan Circle gang affiliation. (*Id.*). Representatives from the Unit Classification Committee, Regional Director, and the State Classification Committee agreed to designate Wheeler as a member of the Aryan Circle. (*Id.*).

Mr. Garcia explains that inmates may formally renounce and disassociate from a gang or other Security Threat Group though the GRAD process. (*Id.*). To be eligible for the GRAD process, an inmate must state in writing to the Unit Security Threat Group Officer that the inmate wants to renounce his or her gang membership. (*Id.* at 4). An inmate must then complete the Disassociation Investigation Process. (*Id.*). This process includes an interview to confirm that the inmate wants to disassociate from the gang; documenting the disassociation investigation;

---

³ The Security Threat Group Management Office "is an administrative office within TDCJ and is responsible for overseeing the gang identification, confirmation, and monitoring process." (Docket Entry No. 39-2 at 3).

5

removing gang-related material from the inmate's possession; obtaining the inmate's statement of facts to support the disassociation request; and adding the inmate to the unit mail monitor list. (*Id.*; *see also* Docket Entry No. 39-3 at 2). If the Unit Security Threat Group Officer decides that the inmate's disassociation is warranted, then the Unit Security Threat Group Officer completes a gang member disassociation form and provides the Officer's recommendation as to whether the inmate should be considered for placement in the GRAD process or remain a confirmed gang member. (Docket Entry No. 39-2 at 4). The Unit Security Threat Group Officer submits the disassociation packet, which is forwarded to the unit warden. The warden reviews the packet and either agrees or disagrees with the recommendation. (*Id.*). If the warden agrees, then the packet is further reviewed by the Security Threat Group coordinator. (*Id.*). If the warden does not agree, he or she must explain why. (*Id.*).

An inmate approved to participate in the GRAD process must successfully complete the nine-month process to be released to general population. (*Id.* at 3). An inmate who completes the process is released to general population and placed on a unit determined by the State Classification Committee. (*Id.*). However, if there is evidence that an inmate has continued gang involvement after the inmate has been confirmed as an ex-gang member, then the Unit Security Threat Group Officer investigates to determine whether the inmate should be reconfirmed as a gang member. (*Id.* at 4). If an inmate successfully completes the GRAD process but is subsequently reconfirmed as a gang member, that inmate is not allowed to go through the GRAD process again. (*Id.* at 3). Mr. Garcia explains that this is to "prevent inmates from manipulating the program . . . and to further discourage inmates from rejoining a gang because they will not be given a second opportunity to complete the GRAD process." (*Id.*). Although an inmate is not given a second opportunity to complete the GRAD process, an inmate "can request a

6

Disassociation Investigation and, if disassociated, the inmate's Classification records will be updated to reflect that for the purpose of parole consideration." (*Id.* at 5).

Wheeler began his first Disassociation Investigation on June 7, 2002. (*Id.* at 4). At that time, inmates were required to participate in a 24-month Disassociation Investigation. (*Id.*). Wheeler's Disassociation Investigation was completed on June 1, 2004, and he was placed on a waiting list to attend the GRAD process at the Ramsey Unit. (*Id.*). On July 27, 2006, Wheeler began the GRAD process, and on May 23, 2007, he completed the GRAD process and was released from restrictive housing to general population. (*Id.*).

In July 2010, however, it was discovered that Wheeler had enhanced his Aryan Circle membership tattoo by adding diamond rays. (*Id.*). Additionally, the Roach Unit Security Threat Group Officer found evidence that Wheeler was communicating with existing Aryan Circle members. (*Id.*). Wheeler was reconfirmed as a gang member and returned to restrictive housing on August 31, 2010. (*Id.*).

Wheeler's second 24-month Disassociation Investigation began on September 19, 2010, and was completed on August 13, 2012. (*Id.*). Wheeler remained in restrictive housing until he was paroled on March 27, 2015. (*See id.*; Docket Entry No. 39-4 at 3). Although Wheeler was on parole at the time, the Eastham Unit Security Threat Group office denied Wheeler's disassociation request in 2016, explaining: "Offender statement indicates he was not associating with the A[ryan] C[ircle] evidence submitted for reconfirmation, namely his tattoo as an example, show full support of this activity." (Docket Entry No. 39-2 at 4).

Wheeler's parole was revoked and he was returned to TDCJ custody on October 9, 2019, after he was convicted of theft of property.[4] (*Id.* at 5; *see also* Docket Entry No. 39-4 at 5). Mr.

---

[4] Thus, Wheeler was not in TDCJ custody from approximately March 2015 through October 2019.

7

Garcia explains that if an inmate who was confirmed as a member of a Security Threat Group is released from TDCJ custody but then returns to TDCJ custody at a later date, the inmate will still be considered a gang member and any disassociation process must begin again once the inmate submits a new request to disassociate.[5] (Docket Entry No. 39-2 at 5).

Around October 10, 2019, a Security Threat Group Officer reviewed Wheeler's social media and saw that a confirmed Aryan Circle member had commented on one of Wheeler's posts. This constituted evidence of Wheeler's continued involvement with the Aryan Circle. (*Id.*). On October 11, 2019, Wheeler was placed in restrictive housing on the basis of his involvement with the Aryan Circle. (*Id.*). The TDCJ Restrictive Housing Plan describes restrictive housing as a "non-punitive, maximum custody status involving the separation of an offender from general population for maintaining safety, security, and order among offenders, staff, and the public . . . ." (Docket Entry No. 39-5 at 12). "An offender is considered to be in restrictive housing any time the offender is separated from the general population by confinement, by themselves, in a cell for 22 hours or more each day to preserve the safe and secure operation of the facility." (*Id.*). Restrictive housing consists of three categories: security detention, pre-hearing detention, and transient status pending the outcome of an Offender Protection Investigation. (*Id.*). Security detention, the category of restrictive housing that applies to Wheeler, is "used for an offender who

---

[5] The Security Threat Group Manual states:

> Should the offender be released from the TDCJ by discharge, parole, mandatory supervision, or any other reason and the disassociation investigation has not been completed the [Unit Security Threat Group Officer] shall terminate the disassociation investigation. Should the offender return to the TDCJ at a later date, the offender shall still be considered a gang member and any disassociation from that group shall be begin [sic] all over again once the offender submits a request to disassociate.

(Docket Entry No. 39-3 at 3).

8

is a current escape risk; threat to the physical safety of other offenders or staff . . .; threat to the order and security of the prison as evidenced by repetitive serious disciplinary violations; or a confirmed member of a security threat group (STG)." (*Id.*; *see also* Docket Entry No. 39-6).

Inmates whose confinement in restrictive housing is categorized as Security Detention are broken down into three levels—Levels I, II, and III—based on the inmate's behavior. (Docket Entry No. 39-5 at 13). Level I "is used to designate offenders who generally maintain good behavior but require separation from general population offenders." (*Id.*). Inmates who are designated as Level I Security Detention are permitted: (1) the opportunity for recreation for one hour per day, seven days per week, with two hours of the weekly out-of-cell recreation taking place outdoors; (2) general visits; (3) to write and receive correspondence; (4) to spend up to $70 every two weeks in the commissary; and (5) in-cell art and craft items. (*Id.* at 26–30). Inmates in all levels of restrictive housing are: (1) allowed access to in-cell programs and may participate in in-cell correspondence courses; (2) allowed access to counselors, chaplains, and health care services; (3) provided access to general library books seven days per week and given access to law library books. (*Id.* at 31, 32, 36). Wheeler was categorized as a Level I offender during his time in restrictive housing. (*See* Docket Entry No. 39-6).

In a letter dated June 12, 2021, Wheeler asserted that he was incorrectly reconfirmed as a gang member and requested reconsideration. (*See* Docket Entry No. 39-2 at 5). Bledsoe, who was the Region I Security Threat Group Coordinator at the time, interviewed Wheeler around June 29, 2021, at the Ferguson Unit about his request to be released from restrictive housing and his claim that he had been mistakenly reconfirmed as an Aryan Circle member. (*Id.*). At the interview, Wheeler admitted to being an Aryan Circle member between 1994 and 2001, but denied that he had held any type of rank, despite TDCJ documentation showing that he had previously admitted

9

to holding the rank of lieutenant. (*Id.*). During the interview, Wheeler admitted that he had added to his Aryan Circle tattoo after completing the GRAD process, but he claimed that the additions were the start of a tattoo cover-up. (*Id.*). Mr. Garcia asserts that images of the tattoo do not support Wheeler's statement. (*Id.*). Wheeler told Bledsoe that his cellmate was a member of the Aryan Circle and that he hung around with other Aryan Circle members while he was in general population. (*Id.*). Bledsoe asked Wheeler to provide a detailed written statement about his gang membership history to initiate another Disassociation Investigation. (*Id.*). Wheeler submitted this statement on June 29, 2021. (*Id.*).

On July 2, 2021, the Disassociation Investigation was discontinued because it was determined that Wheeler was still active in the Aryan Circle gang.[6] (*Id.*). In November 2021, the Security Threat Group Management Office received a complaint from an inmate "who feared he was in danger from Wheeler." (*Id.*). The Security Threat Group Management Office also received information that Wheeler was still an active member of the Aryan Circle and had been extorting money from inmates for the gang. (*Id.*).

Mr. Garcia explains that Wheeler's status of being confined to restrictive housing has been reviewed at Security Detention Review hearings, which have occurred approximately every six months since Wheeler was returned to TDCJ after his parole revocation in 2019. (*See id.* at 5–6). The State Classification Committee determines whether to continue an inmate's confinement in security detention. (*Id.* at 5–6). "If the [State Classification Committee] determines the inmate shall remain in security detention, the [State Classification Committee] must further determine if any of the current conditions or restrictions will change, or if the level of assignment will change, including whether the inmate should remain in restrictive housing." (*Id.* at 6).

---

[6] Mr. Garcia notes that Wheeler was eligible to submit a request to initiate a new Disassociation Investigation on July 2, 2022. (Docket Entry No. 39-2 at 5).

10

Most recently, Wheeler submitted a Gang Member Renouncement Form dated August 7, 2023, and an I-60 request to participate in the GRAD process. (*Id.*). Mr. Garcia explains that "[w]hile not able to attend the GRAD program, Wheeler is not prohibited from requesting Disassociation Investigations, which are separate from the GRAD program. The Disassociation Investigation process allows an inmate to prove disassociation from a S[ecurity] T[hreat] G[roup], which can be considered for the purposes of parole." (*Id.*).

### D. Wheeler's Response

In his response to the summary judgment motion, Wheeler asserts that he has been denied release on parole at least three times due to his classification as a member of a Security Threat Group. (Docket Entry No. 42). Wheeler also states that the defendants' summary judgment motion is the first time he has heard about an inmate reporting that Wheeler threatened him and extorted money. Wheeler states that he has never been questioned about these accusations. He argues that extortion is against TDCJ rules, and if this accusation was true, he should have been charged with extortion and disciplined by the TDCJ. Wheeler concludes that because the TDCJ has not taken any action in response to the accusations, there must not have been any evidence to support this claim. Wheeler acknowledges that his former cellmate was an Aryan Circle member, but points out that inmates have no control over who is assigned as a cellmate. Wheeler asserts that the darkening of his tattoo was done around 2002 and before he began the GRAD process.

## II. The Standards of Review

### A. The Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477

11

U.S. 317, 322 (1986); *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013). The initial burden falls on the movant to identify "those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The movant "may meet its burden by simply 'pointing to an absence of evidence to support the nonmoving party's case.'" *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 544 (5th Cir. 2005) (quoting *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003)).

Once the movant presents a properly supported motion for summary judgment, the burden shifts to the non-movant to show with significant probative evidence the existence of a genuine issue of material fact. *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). The non-moving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012) (per curiam) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)). "Conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).

A reviewing court "must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment . . . ." *Smith v. Reg'l Trans. Auth.*, 827 F.3d 412, 417 (5th Cir. 2016) (quoting *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 447 (5th Cir. 1995)). Factual controversies, however, are resolved in favor of the non-movant only when "both parties have submitted evidence of contradictory facts." *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (quotation omitted). Without proof, a reviewing court will not assume that the non-movant could or would prove the necessary facts. *See McCallum Highlands, Ltd. v. Wash. Cap. Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995). Further, a court need not

comb the record to find evidence that will permit a non-movant to survive summary judgment. *See Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)).

### B. Pleadings by Self-Represented Litigants

Although Wheeler is representing himself, "the notice afforded by the Rules of Civil Procedure and the local rules" is considered "sufficient" to advise a self-represented litigant of his burden in opposing a summary-judgment motion. *Martin v. Harrison Cnty. Jail*, 975 F.2d 192, 193 (5th Cir. 1992) (per curiam). Even a self-represented plaintiff must specifically refer to evidence in the summary-judgment record to place that evidence properly before the court. *See EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 484 (5th Cir. 2014) ("Despite our general willingness to construe pro se pleadings liberally, we still require pro se parties to fundamentally abide by the rules that govern the federal courts. Pro se litigants must properly . . . present summary judgment evidence . . . .") (cleaned up).

## III. Discussion

The defendants argue that Wheeler has not met his burden to show that he is entitled to summary judgment on this Fourteenth Amendment Due Process claim. The defendants assert that Wheeler has not established that his assignment to restrictive housing deprived him of a protectable liberty interest, and second, that he has received all the process he is due.

"To invoke the procedural protections of the Fourteenth Amendment's Due Process Clause, a § 1983 complainant must first show a protected liberty interest is at stake." *Carmouche v. Hooper*, 77 F.4th 362, 366 (5th Cir. 2023) (citing *Wilkerson v. Goodwin*, 774 F.3d 845, 851 (5th Cir. 2014)). "The types of interests that qualify are limited." *Id.* (citing *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)). "In the context of disciplinary convictions and

13

any resulting confinement in administrative segregation, such interests are generally limited to restrictions that lengthen the prisoner's sentence and restraints imposing 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Id.* (quoting *Wilkerson*, 774 F.3d at 852). "Once a liberty interest is established, courts consider 'whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *Id.* (quoting *Thompson*, 490 U.S. at 460).

### A. A Protectable Liberty Interest

"Generally, 'administrative segregation, without more, does not constitute a deprivation of a constitutionally cognizable liberty interest.'" *Id.* (quoting *Luken v. Scott*, 71 F.3d 192, 193 (5th Cir. 1995)). Placement in restrictive housing is generally viewed as an ordinary, expected, and permissible incident of prison life. *See Pichardo v. Kinker*, 73 F.3d 612, 612 (5th Cir. 1996) (holding that "absent extraordinary circumstances, administrative segregation . . . being an incident to the ordinary life as a prisoner, will never be a ground for a constitutional claim").

Assignment to restrictive housing can implicate a liberty interest when it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Wilkerson*, 774 F.3d at 853 (quoting *Hernandez v. Velasquez*, 522 F.3d 556, 562 (5th Cir. 2008)). The Supreme Court has identified three factors relevant to whether confinement in segregation is atypical and significant: (1) the severity of the confinement restrictions in restrictive housing; (2) the duration of the confinement in restrictive housing; and (3) whether assignment to restrictive housing has any collateral consequences on the inmate's sentence, such as whether that placement disqualifies an otherwise eligible inmate for parole. *Wilkinson v. Austin*, 545 U.S. 209, 223–24 (2005); *see also Wilkerson*, 774 F.3d at 853 (when determining whether an inmate's conditions of confinement implicate a liberty interest, a court is to consider "the nature of the more-restrictive

14

confinement *and* its duration in relation to prison norms and to the terms of the individual's sentence") (quoting *Harden-Bey v. Rutter*, 524 F.3d 789, 792 (6th Cir. 2008)).

### 1.     The severity of the confinement

Wheeler has alleged that restrictive housing is harsher than the conditions of general population. He asserts that he is confined in a solitary cell; he is allowed out of his cell for only one hour a day for recreation and shower; before leaving the cell, he is strip searched and handcuffed; he is not allowed contact visits with family and friends; and he cannot participate in educational, vocational, religious, or cognitive classes. In response, the defendants assert that under the Restrictive Housing Plan, Wheeler is still permitted several privileges, including the opportunity for recreation for one hour per day, seven days per week; general visits; commissary spend in the amount of $70 every two weeks; writing and receiving correspondence; in-cell art and craft items; access to in-cell programs and opportunities for participation in in-cell correspondence courses; access to counselors, chaplains, and health care services; and access to general library books seven days per week and access to law library books.

Despite Wheeler describing certain aspects of his confinement in restrictive housing, he does not explain what being housed in general population is like; the court, therefore, is not able to compare the two types of housing. *See Donaldson v. Ducote*, 112 F. App'x 329, 332 (5th Cir. 2004) (per curiam) (finding that the inmate did not present a cognizable Fourteenth Amendment due-process claim when he did not "allege any facts that might support an inference that his confinement in maximum security is excessively harsh when compared to the ordinary incidents of prison life"); *Rroku v. Cole*, 726 F. App'x 201, 205 (5th Cir. 2018) (per curiam) (finding that the inmate did not show that he had a cognizable liberty interest with respect to his conditions of confinement when the inmate did not provide "evidence of detention norms with respect to the

15

general population of detainees to which his conditions of confinement can be compared"). Although Wheeler generally asserts that he cannot "participate in educational, vocational, religious, or cognitive classes[,]" (*see* Docket Entry No. 9 at 5–6), he does not dispute the defendants' summary judgment evidence that inmates categorized as Level I are allowed access to in-cell programs, including in-cell correspondence courses; are allowed access to counselors, chaplains, and health care services; are provided access to general library books and law library books; and are permitted in-cell art and craft items.

In short, the summary judgment evidence of the circumstances of Wheeler's confinement in restrictive housing do not show atypical or significant hardship in relation to the ordinary incidents of prison life. *See, e.g.*, *LaVergne v. Stutes*, 82 F.4th 433, 436–37 (5th Cir. 2023) (affirming the district court's determination that no liberty interest was implicated when the inmate alleged that he was confined to a cell 23 hours per day from August 2012 to June 2017, but was permitted to have two contact visits per month, make phone calls, cook food, exercise one hour a day, outdoor recreation for three hours a week, and to have conversation or communication with other inmates); *Escobarrivera v. Whitaker*, No. 21-30147, 2022 WL 17352178, at *4 (5th Cir. Dec. 1, 2022) (per curiam) (holding that the plaintiff inmate did not create a fact issue that his confinement imposed atypical or significant hardships in relation to the ordinary incidents of prison life when the inmate alleged that he was confined for 23 hours in cell by himself, he ate his meals alone, he was prevented from attending church services, and his confinement was allegedly "indefinite"; the inmate's barred cell gave him an opportunity to communicate with other inmates, he could roam the halls and interact with others during his hour of release, he received three additional one-hour sessions a week outside, and he had access to visitation twice a month).

      *2.     The duration of the confinement*

Wheeler has been confined in restrictive housing for approximately four years and nine months.[7] In a recent case, the Fifth Circuit found that an inmate's confinement in solitary confinement for four years and six months did not, "at least at this point, tip the scale towards severity." *Escobarrivera*, 2022 WL 17352178, at *4; *see also LaVergne*, 82 F.4th at 436–37 (affirming the district court's determination that no liberty interest was implicated when the inmate was in solitary confinement for almost five years); *Fountain v. Rupert*, No. 6:15CV100, 2024 WL 2106521, at *33 (E.D. Tex. Jan. 9, 2024) (finding that an inmate's confinement in administrative segregation for eight years did not give rise to a liberty interest), *R&R adopted by* 2024 WL 1530805 (E.D. Tex. Apr. 9, 2024).

Despite Wheeler's assertion to the contrary, his confinement in restrictive housing is not of an indefinite duration. *See Wilkerson*, 774 F.3d at 856 (explaining that in *Wilkinson*, 545 U.S. at 214–15, the Supreme Court "considered the indefinite duration of the confinement at [the] [s]upermax [facility] to be a significant factor" in determining whether a liberty interest was implicated); *Fountain*, 2024 WL 2106521, at *30 ("Federal courts are particularly concerned with indefinite placement in restrictive housing."). Wheeler does not dispute the summary judgment evidence that his status of being confined to restrictive housing has been reviewed by the State Classification Committee at Security Detention Review hearings, which have occurred approximately every six months since Wheeler was returned to TDCJ when his parole was revoked in 2019. (*See* Docket Entry No. 39-2 at 5–6).

---

      [7] Wheeler asserts that he has been in restrictive housing for over eight years, but the summary judgment evidence reflects that he has been held in restrictive housing for approximately four years and nine months, since his parole was revoked and he returned to TDCJ custody on October 9, 2019.

Considering the length of Wheeler's present confinement in restrictive housing and the fact that his status in restrictive housing is reviewed every six months at Security Detention review hearings, the court finds that the duration of his confinement is not so severe as to be an atypical and significant hardship.

### 3. Any collateral consequences

Although Wheeler asserts that he has been denied parole because of his status as a gang member (*see* Docket Entry No. 9 at 6; Docket Entry No. 42 at 1), the defendants argue that this assertion is contradicted by the summary judgment evidence. The defendants are correct.

Wheeler was released on parole in 2015, despite his identification as a gang member at that time. Although Wheeler cannot participate in the GRAD process for a second time, he can request a Disassociation Investigation and, if disassociated, his inmate classification records will be updated to reflect that for the purpose of parole consideration. Third, at his most recent parole reviews in 2020, 2021, 2022, and 2023, the decision not to grant Wheeler parole was based on multiple reasons, including that "the record indicates that [Wheeler] has repeatedly committed criminal episodes that indicate a predisposition to commit criminal acts upon release" and "the record indicates unsuccessful periods of supervision on previous probation, parole, or mandatory supervision that resulted in incarceration" (Docket Entry No. 42 at 5–7; *see also* Docket Entry No. 39-4 at 6). Wheeler has not met his burden to show that his status as a gang member is the only reason he has been denied parole or, more importantly, that his confinement in restrictive housing has prevented him from parole eligibility.

On the record before the court, Wheeler has not met his summary judgment burden to show that his time in restrictive housing has given rise to a protectable liberty interest. Even if Wheeler

had made this showing, he would not be entitled to relief because, for the reasons discussed below, he has received the process he is due.

### B.     What Process is Due

"Because the requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands,'" the Supreme Court has "generally declined to establish rigid rules and instead [has] embraced a framework to evaluate the sufficiency of particular procedures." *Wilkinson*, 545 U.S. at 224 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). In other cases in which inmates have challenged solitary confinement, the Fifth Circuit has found that informing the inmate of the factual basis for his confinement in restrictive housing and giving the inmate an opportunity to object before the final level of review satisfied due process. *See Hope v. Harris*, 861 F. App'x 571, 580 (5th Cir. 2021) (per curiam); *Striz v. Collier*, No. 20-40878, 2022 WL 1421834, at *1 (5th Cir. May 5, 2022) (an inmate was provided with due process through advance notice of review hearings and the opportunity to speak and submit evidence at the hearings), *cert. denied,* 143 S. Ct. 408 (2022); *Luken*, 71 F.3d at 194 (finding no liberty interest when the inmate's custodial status was periodically reviewed).

The uncontroverted summary judgment evidence of TDCJ policy shows that inmates in restrictive housing must be provided with written notice of a classification hearing held to consider their housing. (*See* Docket Entry No. 39-5 at 21). At the classification hearing, inmates are permitted to make a statement, submit written statements from witnesses, and submit other evidence. (*Id.*). Inmates must be provided with written documentation of the decision, including the reasons. (*Id.*). Inmates have the right to appeal classification decisions. (*See id.* at 24). Wheeler's confinement in restrictive housing has been reviewed approximately every six months since his return to TDCJ after his parole revocation. (Docket Entry No. 39-2 at 5; *see also* Docket

Entry No. 39-5 at 21). Wheeler challenges certain evidence that TDCJ relied on to support his reconfirmed status as a gang member—specifically, the additions to his tattoo and the fact that an inmate assigned to be his cellmate was a suspected member of the Aryan Circle. But Wheeler was able to raise these points before the TDCJ and to contest the truthfulness of the information relied on to assign him to restrictive housing. In short, Wheeler has not shown a factual dispute material to determining that he has received the process required.

Wheeler has failed to establish a Fourteenth Amendment Due Process violation. The court grants the defendants' motion for summary judgment.

## IV.     Conclusion

The defendants' motion for summary judgment, (Docket Entry No. 39), is granted. This action is dismissed with prejudice. Any pending motions, including the plaintiff's motion for summary judgment, (Docket Entry No. 34), are denied as moot. Final judgment will be entered separately.

SIGNED on July 29, 2024, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge